IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIAM GEORGE, on behalf of        )
himself and all others similarly    )
situated,                           )
                                    )    2:09-cv-01610-GEB-DAD
          Plaintiff,                )
                                    )    ORDER GRANTING DEFENDANTS'
     v.                             )    MOTION TO DISMISS*
                                    )
CALIFORNIA INFRASTRUCTURE AND       )
ECONOMIC DEVELOPMENT BANK, a public )
instrumentality of the State of     )
California and ORRICK, HERRINGTON    )
& SUTCLIFFE, LLP, an entity,        )
                                    )
          Defendants.               )
_____)

          Defendants California Infrastructure and Economic

Development Bank ("I-Bank") and Orrick, Herrington & Sutcliffe LLP

("Orrick") (collectively, "Defendants") filed a motion to dismiss

Plaintiff William George's ("George") first amended consolidated

complaint under Federal Rule of Civil Procedure 12(b)(6) and the

Private Securities Litigation Reform Act of 1995 ("PSLRA").

Defendants argue George has not "alleged facts sufficient to state a

claim for violation of Section 10(b) of the Securities Exchange Act of

1934 or Rule 10b-5(a), (b) or (c) promulgated thereunder," and since

_____
          *    This matter is deemed to be suitable for decision without oral
argument.  E.D. Cal. R. 230(g).

1

George's complaint "is the fourth separate pleading effort in this case," the dismissal ruling should be with prejudice.  (Not. of Mot. to Dismiss 2:9-11; Mot. to Dismiss 25:14-15.)  George opposes Defendants' dismissal motion.

An entity named Copia Claims initiated this action on June 10, 2009, filing a complaint alleging violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, arising from allegedly misleading statements and omissions in a prospectus used to market bonds issued by I-Bank in 2007.  In an order issued on September 15, 2009, George was appointed to be the lead plaintiff for the putative class action.  Thereafter, on October 20, 2009, George filed an initial "consolidated complaint."  Defendants filed a dismissal motion on December 4, 2009; however, on December 29, 2009, George filed a first amended consolidated complaint, mooting Defendants' dismissal motion.  Defendants' pending dismissal motion was filed on February 5, 2010, and addresses George's first amended consolidated complaint.

## I.  LEGAL STANDARD

When reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "[t]he court accepts the plaintiff['s] allegations as true and construes them in the light most favorable to the plaintiff[]."  Metzler Inc. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1061 (9th Cir. 2008) (quotation and citation omitted).  "[D]ismissal [is] inappropriate unless the plaintiff['s] complaint fails to state a claim to relief that is plausible on its face.  Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 989 (9th Cir. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)).  "[R]eview is generally limited to the face of the complaint, materials

2

incorporated by reference, and matters" which may be judicially noticed.  Id.  Defendants' dismissal motion is accompanied by a request that judicial notice be taken of certain press reports and bankruptcy filings related to this case.  However, this request need not be decided since these documents are not necessary for resolution of Defendants' dismissal motion.

Since George's first amended consolidated complaint is "a putative securities fraud class action, [it] is also subject to the pleading requirements of the PSLRA."  Metzler, 540 F.3d at 1061 (citing DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 388 (9th Cir. 2002)).  The PSLRA imposes "heightened pleading requirements" which "are an unusual deviation from the usually lenient requirements of [the] federal rules . . . ."  Ronconi v. Larkin, 253 F.3d 423, 437 (9th Cir. 2001).  This heightened standard is explained by the Ninth Circuit as follows:

> In order to state a claim for securities fraud that complies with the dictates of the PSLRA, the complaint must raise a "strong inference" of scienter- *i.e.,* a strong inference that the defendant acted with an intent to deceive, manipulate, or defraud. In reviewing a complaint under this standard, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs.  This examination requires the court to survey the complaint in its entirety, not to simply scrutinize individual allegations in isolation.  The PSLRA also requires that the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. By requiring specificity, [15 U.S.C.] § 78u-4(b)(1) prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the

defendant's alleged statements or omissions are deceitful.

Metzler, 540 F.3d at 1061 (quotations and citations omitted) (emphasis in original).

### II. George's First Amended Consolidated Complaint

#### A.   The Parties

George and the proposed class members purchased certain section 501(c)(3) revenue bonds issued by Defendant I-Bank between June 1, 2007 and December 1, 2008 (the "2007 Bonds"). (First Amended Consolidated Compl. ("FAC") ¶ 12.)

Defendant I-Bank is a "public instrumentality of the State of California" which "issues tax exempt revenue bonds" that "create public benefits in California communities where a sponsored project is located by enhancing the economic, social or cultural quality of life for local residents." (Id. ¶ 2.)

Defendant Orrick is "an entity comprised  . . . of Members of the State Bar of California engaged in the active practice of law . . . ." (Id. ¶ 3.)  I-Bank employed Orrick to provide it with legal services in connection with the issuance of certain section 501(c)(3) revenue bonds in 1999 and 2007. (Id. ¶¶ 4, 5.)

I-Bank loaned the proceeds of the 1999 and 2007 bond issuances to a California non-profit corporation named COPIA: The American Center for Wine, Food and the Arts ("Copia"), which is located in Napa, California. (Id. ¶¶ 18, 30, Exs. 1, 2.)

#### B.   The 1999 and 2007 Bond Issuances

I-Bank issued approximately $70 million in revenue bonds in 1999 (the "1999 Bonds"). (FAC ¶¶ 5, 20.)  Orrick served as bond counsel for this bond issuance. (Id. ¶ 5.)  I-Bank loaned the

proceeds from the 1999 bond issuance to Copia to finance the construction and development of Copia's cultural institution, museum and educational center in Napa.  (FAC Ex. 2.)  The terms of the 1999 bond transaction were embodied in an indenture entered into by I-Bank and BNY Western Trust Company on July 1, 1999.  (Id.)  I-Bank's loan to Copia was secured by a first deed of trust on certain of Copia's real property.  (FAC ¶ 30.)

George further describes the 1999 Bonds in his complaint, alleging:

> Most [of the] [19]99 Bonds were locked in (and therefore could not be paid off) until December 1, 2009 . . . .  The only way to pay (and thereby achieve defeasance of) [the] [19]99 Bonds before December 1, 2009, was to arrange for an escrow account in which to safely hold the funds necessary to eventually pay the [19]99 Bonds on December 1, 2009.  In such a case, [the] [19]99 Indenture expressly provided that an opinion by [Orrick,] Issuer's [19]99 Bond Counsel[,] was required to the effect that (i) the escrow deposit would not be a voidable preference and (ii) the escrow deposit would not be a fraudulent transfer under either the Bankruptcy Code or any similar state or federal statute should Borrower become bankrupt or otherwise subject to such other similar state or federal statutes.

(FAC ¶¶ 30, 31.)

Copia opened its cultural center in 2001, but struggled financially.  (FAC ¶ 32.)  In 2007, Copia again turned to I-Bank to raise funds through an additional bond issuance.  (Id. ¶¶ 18-20.)  On May 24, 2007, I-Bank received $77,612,773.55 from its underwriter and immediately loaned that sum to Copia.  (Id. ¶ 18.)  On June 1, 2007, the 2007 Bonds went on sale to the public and were marketed through the use of a prospectus (the "Prospectus").  (Id. ¶ 19.)  George, and the members of the proposed class, purchased the 2007 Bonds between June 1, 2007 and December 8, 2008.  (Id. ¶ 12.)  The 2007 bond

transaction was secured by a second deed of trust on certain of Copia's real property.  (Id. ¶ 75.)  Orrick again served as bond counsel for the 2007 bond issuance.  (Id. ¶ 52.)

The Prospectus states that I-Bank's 2007 loan to Copia would be used, in part, to "advance refund" the outstanding 1999 Bonds. (Id. Ex. 1 at 1.)  Specifically, the Prospectus provides that "[u]pon the issuance of the [2007] Bonds, a portion of the proceeds of the [2007] Bonds will be deposited in an escrow fund . . . and irrevocably pledged to the payment of the principal and interest and premium on the [1999] Bonds . . . ."  (Id.)

Despite these infusions of capital, Copia filed for Chapter 11 bankruptcy on December 1, 2008.  (FAC ¶ 75.)  George alleges that because Orrick never issued "the necessary opinion," "there was never any pre-bankruptcy defeasance of [the] [19]99 Bonds."  (Id. ¶ 74.) George further alleges that "[a]s a result, the underlying obligation . . . on [the] [19]99 Bonds was never extinguished" and the 1999 Bonds "remained secured by an unrecorded equitable lien on [Copia's] assets at the time [Copia] filed for bankruptcy."  (Id. ¶¶ 74-75.)  George also alleges that after Copia filed its bankruptcy petition, Copia's bankruptcy trustee was able to "avoid the unrecorded equitable lien . . . thus putting [the purchasers of the 1999 and 2007] Bonds . . . in the position of being entirely unsecured creditors of [Copia]." (Id. ¶ 75.)  However, George also alleges that under Copia's now confirmed bankruptcy plan, certain of Copia's real property was distributed to a trust for the benefit of the 2007 Bondholders.  (Id. ¶ 81.)  Further, George alleges that the 1999 Bonds "wound up being defeased . . . by virtue of a settlement incorporated into the [Bankruptcy] Plan . . . ."  (Id.)

1 //

2 ## C.  George's Securities Fraud Allegations

3 George alleges the Prospectus included materially misleading

4 statements concerning when the 1999 Bonds would be defeased:

> [The] Prospectus contains misleading statements
> which . . . read, in pertinent part, and under the
> heading PLAN OF FINANCING as follows:
>
> Certain preconditions to the defeasance of [99]
> Bonds . . . are not expected to be met until
> September 7, 2007.  In particular, the occurrence
> of an Act of Bankruptcy by [Borrower on or before]
> . . . September 7, 2007, would prevent the legal
> defeasance of [99] Bonds from the proceeds of the
> 07 Bonds.  Until [99] Bonds are defeased . . . [07]
> Bonds will be subordinate to [99] Bonds . . . .
> After the defeasance of [99] Bonds . . . it is
> expected that . . . [99] Bonds will be deemed paid
> and no longer outstanding . . . .  Assuming that
> [07] Bonds are delivered in May 2007 and that [an]
> Escrow Fund is funded on such date of delivery, it
> is expected that the preconditions to the
> defeasance of [99] Bonds . . . will be met by
> September 7, 2007.

16 (FAC ¶ 21) (ellipses and brackets in original).  George further

17 alleges that "[a]t page 2 of [the] Prospectus there was a misleading

18 description falsely conveying that the preconditions to defeasance of

19 the [1999] Bonds would be met according to the expected timing of such

20 defeasance (not later than September 7, 2007)."  (Id. ¶ 56.)

21 George also alleges the Prospectus omitted Orrick's

22 "unwillingness . . . to opine that the portion of the proceeds from

23 the $77,612,773 loan[] to [Copia] by [I-Bank] that [was] being set

24 aside in order to [defease the 1999 Bonds] [would] not constitute a

25 voidable transfer under the Bankruptcy Code . . . ."  (Id. ¶ 57.)

26 George contends Orrick had an "affirmative duty" to disclose this

27 information since "Members of the State Bar of California . . . .[may

28 not] engage in intentionally tortious conduct . . . ."  (Id. ¶ 57.)

1    George further alleges these "Misleading Statements and
2  Material Omissions" "were false when made because the [1999] Bonds
3  could not properly and legally be defeased without the required legal
4  opinions that (i) the escrow deposit would not be a voidable
5  preference and (ii) the escrow deposit would not be a fraudulent
6  transfer (iii) under the Bankruptcy Code or any similar state or
7  federal statute (iv) should [Copia] become bankrupt or otherwise
8  subject to other insolvency laws."  (Id. ¶ 58.)  George pleads that
9  each defendant "actually knew that the affirmative statements in the
10  Prospectus regarding the use to which the proceeds of [the] [2007]
11  Bonds were to be put, to wit, for [the 1999] Bonds Defeasance, were
12  untrue when made and nonetheless intentionally went ahead and put them
13  in [the] Prospectus despite such actual knowledge of their falsity."
14  (Id. ¶ 29.)

15    George alleges that he and the proposed class members have
16  "been damaged" by their purchase of the 2007 Bonds since the 2007
17  Bonds were always "patently worthless" and "never had any intrinsic
18  value other than their entirely speculative unsecured distribution
19  rights from [Copia's] bankruptcy estate."  (Id. ¶ 82.)

20                          **III.  DISCUSSION**

21              **A.  Elements of a Securities Fraud Claim**

22    "Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), in
23  combination with SEC Rule 10b-5, prohibits any act, practice, or
24  course of business which operates or would operate as a fraud or
25  deceit upon any person, in connection with the purchase or sale of any
26  security."  Siracusano v. Matrixx Initiatives, Inc., 583 F.3d 1167,
27  1177 (9th Cir. 2009) (quotations and citations omitted).  "To state a
28  claim under Section 10(b) [and Rule 10b-5], a plaintiff must [allege]

8

(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Thompson v. Paul, 547 F.3d 1055, 1060 (9th Cir. 2008) (quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 156 (2008)). Defendants argue George's complaint should be dismissed since he has failed to adequately allege five of these six elements.

### B.   The Element of Reliance

Defendants argue George's complaint should be dismissed since he has not pled that "he . . . read the Prospectus, let alone relied on it." (Mot. to Dismiss 21:21-22.) George counters that "the [alleged] omissions . . . give rise to the Affiliated Ute presumption of reliance," and alternatively, the "'fraud created the market' presumption [of reliance]" should apply. (Opp'n 29:10-18.) Defendants rejoin the Affiliated Ute presumption is not applicable to cases such as this, where affirmative misrepresentations are also alleged, and the fraud created the market reliance presumption "has never been accepted by the Ninth Circuit . . . ." (Reply 3:25-4:17) (emphasis in original). Defendants further assert that Plaintiff has not alleged sufficient facts to satisfy the fraud created the market theory were it to be adopted. (Id. 6 n.5.)

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of [a] § 10(b) private cause of action. It ensures that, for liability to arise, the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury exists as a predicate for liability." Stoneridge Inv.

1  *Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008)

2  (quotations and citations omitted).  To satisfy the reliance element

3  "an investor-plaintiff [must] show that he would not have engaged in

4  the transaction in question had he known about the fraud."  *Desai v.*

5  *Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009).

6       George does not allege that he relied upon the alleged

7  misrepresentations and omissions in the Prospectus when he purchased

8  the 2007 Bonds.  Rather, he pleads he "should be _deemed_ to have relied

9  on [the] Prospectus . . . [since the Prospectus' allegedly misleading

10  statements and omissions] constituted a fraud which created the

11  market."  (FAC ¶ 78.)  George, therefore, does not allege direct

12  reliance, but rather, seeks to establish the reliance element by

13  invoking a "presumption of reliance."

14       A Rule 10b-5 plaintiff may avoid pleading direct reliance

15  and satisfy the reliance element by invoking a "presumption of

16  reliance" in two situations.  *Desai*, 573 F.3d at 939 (stating

17  "[r]eliance can be presumed in two situations"); _see also_ *Stoneridge*,

18  552 U.S. at 159 (stating that "[w]e have found a rebuttable

19  presumption of reliance in two different circumstances").  First,

20  "[i]n _omission_ _cases_, courts can presume reliance when the information

21  withheld is material pursuant to *Affiliated Ute Citizens v. United*

22  *States*, 406 U.S. 128, 153-54 (1972)."  *Desai*, 573 F.3d at 939

23  (emphasis added).  Second, "[r]eliance can . . . be presumed in

24  certain circumstances under the so called 'fraud on the market

25  theory.'"  _Id._  Neither of these two recognized reliance presumptions

26  is applicable to George's claim.  George, however, requests that the

27  Court recognize and apply a third presumption - the fraud created the

28  market reliance presumption.

1. **The <u>Affiliated Ute</u> Reliance Presumption**

      In <u>Affiliated Ute</u>, the Supreme Court recognized a presumption of reliance in cases which primarily involve "a failure to disclose."  406 U.S. at 153-54.  This reliance presumption is "confined to cases that primarily allege omissions."  <u>Binder v. Gillespie</u>, 184 F.3d 1059, 1064 (9th Cir. 1999).  Further, the <u>Affiliated Ute</u> presumption is not applicable where "both misstatements and omissions [are alleged] unless the case can be characterized as one that primarily alleges omissions."  <u>Id.</u>; <u>see also</u> <u>Desai</u>, 573 F.3d at 940 (stating that "[t]he presumption of reliance under <u>Affiliated Ute</u> is limited to cases that 'can be characterized as primarily alleging omissions.'") (quotations and citations omitted).

      George has not argued, nor demonstrated that this case, where affirmative misrepresentations and omissions are both alleged, "can be characterized as [a case] primarily alleging omissions." <u>Desai</u>, 573 F.3d at 940 (quotations and citations omitted).  Since George's "complaint contains both allegations of omissions and misrepresentations, . . . at the very least, [it] must be characterized . . . as a mixed case of misstatements and omissions" and the <u>Affiliated Ute</u> reliance presumption is inapplicable.  <u>Binder</u>, 184 F.3d at 1063.

2. **The "Fraud on the Market" Reliance Presumption**

      The "fraud on the market" theory provides an alternative means of establishing the reliance element.  <u>See</u> <u>Desai</u>, 573 F.3d at 939 (stating that "[r]eliance can also be presumed in certain circumstances under the so-called 'fraud on the market theory'") (citation omitted).  However, the "fraud on the market" theory may only be invoked when the securities at issue "were traded on an

efficient market."  <u>In re Cooper Cos.</u>, 254 F.R.D. 628, 639 n.4 (C.D. Cal. 2009) (citing <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 248 (1988) for the requirements for invoking the fraud on the market presumption of reliance); <u>see also</u> <u>Desai</u>, 573 F.3d at 939 (stating the fraud on the market theory "is usually available only when a plaintiff alleges that a defendant made material misrepresentations or omissions concerning a security that is actively traded in an efficient market") (quotations and citations omitted).

Here, George concedes that the market for the 2007 Bonds was "not [an] efficient or developed" market and the 2007 Bonds were "never . . . traded actively in an impersonal market."  (FAC ¶ 50.) Therefore, this theory is not applicable to Plaintiff's claim.  <u>See</u> <u>Desai</u>, 573 F.3d at 942 (stating that "[n]ormally, [an acknowledgment that the market for the securities at issue was not efficient] would amount to a fatal concession.")

**3.  The "Fraud Created the Market" Reliance Presumption**

George argues this court should apply a third reliance presumption - the fraud created the market reliance presumption - which was first recognized by the Fifth Circuit in <u>Shores v. Sklar</u>, 647 F.2d 462 (5th Cir. 1981) (en banc).  Specifically, George argues the fraud alleged in this case "fits squarely within the ambit of the [fraud created the market theory]" since "the [alleged] fraud caused the [2007] Bonds to be offered for sale" when they "were patently worthless and could not have been marketed at any price . . . ." (Opp'n 30:1-13.)

In <u>Shores</u>, the Fifth Circuit "adopted the 'fraud-created-the-market' theory, whereby actors who introduced an otherwise unmarketable security into the market by means of fraud are deemed

guilty of manipulation, and a plaintiff can plead that he relied on
the integrity of the market rather than on individual fraudulent
disclosures . . . ."  Regents of Univ. of Cal. v. Credit Suisse First
Boston (USA), Inc., 482 F.3d 372, 391 (5th Cir. 2007) (quotations and
citations omitted).

>          "Fraud created the market" is a circular theory
>          based on faith in the market itself.  The theory
>          presumes the securities market is legitimate, and
>          that buyers rely on its legitimacy.  Gruber, 776 F.
>          Supp. at 1052.  The Shores doctrine presumes it is
>          reasonable for an average investor to rely on a mix
>          of factors which make up the "integrity" of the
>          market, including the efficiency of the market in
>          the traditional theoretical sense, the regulatory
>          system and the representations of promoters of
>          securities to preclude issuance of securities
>          "where the promoters knew that the subject
>          enterprise was worthless when the securities were
>          issued, and successfully issued the securities only
>          because of defendants' fraudulent scheme."  Wiley,
>          746 F. Supp. at 1291, citing Abell v. Potomac Ins.
>          Co., 858 F.2d 1104, 1122-23 (5th Cir. 1988),
>          vacated on other grounds sub nom. Fryar v. Abell,
>          492 U.S. 914 (1989).  This inquiry focuses on
>          whether the securities "were entitled to be
>          marketed," not merely on whether they were
>          theoretically marketable in a purely fictional
>          sense.  Id. at 1291, citing Abell, 858 F.2d at
>          1121.  As the Shores Court noted, "the securities
>          laws allow an investor to rely on the integrity of
>          the market to the extent that the securities it
>          offers to him for purchase are entitled to be in
>          the marketplace." 647 F.2d at 471.  The reliance in
>          that instance is on the securities laws and the
>          benefits of purchasing newly issued securities in a
>          regulated market, rather than merely the efficiency
>          of an open and developed market.  Wiley, 746 F.
>          Supp. at 1291.

Malack v. BDO Seidman, LLP, No. 08-0784, 2009 WL 2393933, at *6 (E.D.
Pa. Aug. 3, 2009).

>          "[C]ourts that apply [the fraud created the market theory]
appear to agree that the touchstone of this standard is
unmarketability.  Such unmarketability must mean either economic
unmarketability, which occurs when a security is patently worthless,

or legal unmarketability, which occurs when a regulatory or municipal agency would have been required by law to prevent or forbid the issuance of the security." _In re Refco, Inc. Sec. Litig._, 609 F. Supp. 2d 304, 318 (S.D.N.Y. 2009) (citing _Joseph v. Wiles_, 223 F.3d 1155, 1163-66 (10th Cir. 2000)).

However, the fraud created the market theory has not been adopted by the Ninth Circuit. _See In re MDC Holdings Sec. Litig._, 754 F. Supp. 785, 805-06 (S.D. Cal. 1990) (stating that the fraud created the market theory "has not been adopted by the Ninth Circuit and it has been criticized by courts and commentators."); _In re Jenny Craig Sec. Litig._, No. 92-0845-IEG (LSP), 1992 WL 456819, at *6 (S.D. Cal. 1992) (stating "[t]he fraud-created-the-market reliance presumption is used in some jurisdictions, but it has not been adopted by the Ninth Circuit.").

Further, the Ninth Circuit's recent decision in _Desai_ calls into question the continued validity of the "fraud created the market" doctrine. _See Desai_, 573 F.3d at 942. In _Desai_, the Ninth Circuit affirmed the district court's refusal to adopt a new presumption of reliance based upon the "integrity of the market" when ruling on a motion for class certification in a Rule 10b-5 action. _Desai_, 573 F.3d at 942. The Ninth Circuit discussed _Stoneridge_ and noted that "the [Supreme] Court listed the _Affiliated Ute_ presumption and the fraud on the market presumption as the [only] two reliance presumptions it has recognized[,] [and] [a]fter concluding that neither presumption applied, it did not inquire into any other presumption that seemed appropriate, but simply analyzed whether the plaintiffs could prove reliance directly." _Id._ (citing _Stoneridge_, 552 U.S. at 159). The Ninth Circuit then held that under _Stoneridge_

the "district court did not abuse its discretion in refusing to adopt the integrity of the market presumption."  Id.; see also In re Refco, 609 F. Supp. 2d at 318 ("[The] merits [of the fraud created the market presumption] . . . appear to be in grave doubt after Stoneridge."). Stoneridge and Desai caution against allowing George to invoke the fraud created the market reliance presumption.

Even if the Court were to adopt and apply the fraud created the market reliance presumption, George has not sufficiently alleged that the 2007 Bonds were either economically or legally "unmarketable."  "[George's] allegations . . . fall far short of alleging that [the 2007 Bonds] could not have been sold at any price or that [the 2007 Bonds] could not have been offered at any combination of price and interest rate.  Nor are there any allegations that the issuer was prohibited from issuing the [2007 Bonds] as a matter of law."  In re Refco, 609 F. Supp. 2d at 318 (quotations and citations omitted).  George's conclusory allegations that the 2007 Bonds "were entirely unmarketable" and "patently worthless" are insufficient to satisfy the fraud created the market theory.  Id. at 318 n.14 (finding plaintiff's allegation that absent fraud, "there would have been no market for the Bonds" conclusory and insufficient to invoke the fraud created the market theory).  "Under these circumstances, [George] cannot rely on a 'fraud-created-the-market' presumption as a stand-in for reliance . . . ."  Id. (quotation and citations omitted).  George, therefore, has not shown that the fraud created the market reliance presumption may be applied to his claim.

### IV.   CONCLUSION

Since George has not alleged that he relied on Defendants' allegedly material misrepresentations or omissions when purchasing the

2007 Bonds, nor shown that a presumption of reliance is applicable to his securities fraud claim, he has not adequately alleged the reliance element and his allegations of securities fraud are insufficient to state a claim under Section 10(b) and Rule 10b-5.  Therefore, this portion of Defendant's dismissal motion is granted; Defendants' other challenges to George's securities fraud claim need not be decided. While Defendants request that George's complaint be dismissed with prejudice, it is unclear whether George can state a viable claim. Accordingly, George is granted leave to file an amended complaint. Any amended pleading shall be filed within fourteen (14) days of the date on which this order is filed.

Dated:  June 10, 2010

_____
GARLAND E. BURRELL, JR.
United States District Judge