IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM GEORGE, on behalf of himself and all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>CALIFORNIA INFRASTRUCTURE AND ECONOMIC DEVELOPMENT BANK, a public instrumentality of the State of California, and ORRICK, HERRINGTON & SUTCLIFFE, LLP, an entity,<br><br>　　　　　Defendants. | 2:09-cv-01610-GEB-DAD<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS[*] |

　　　　Defendants California Infrastructure and Economic Development Bank ("I-Bank"), and Orrick, Herrington & Sutcliffe LLP ("Orrick") (collectively referred to as "Defendants"), move for an order dismissing with prejudice Plaintiff William George's ("George") Second Amended Consolidated Complaint ("SAC"), under Federal Rule of Civil Procedure ("Rule") 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). George alleges in the SAC a putative class action securities fraud claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 ("§ 10(b)" or "§ 10(b) claim"). Defendants argue

---

　　　[*]　This matter is deemed suitable for decision without oral argument. E.D. Cal. R. 230(g).

that George "has failed to allege sufficient facts to state" a § 10(b) claim. (Defs.' Notice of Mot. and Mot. to Dismiss SAC 1:9-11.)

## I. Background and Factual Allegations

George was appointed lead plaintiff for the putative class, following which George filed a "consolidated complaint." Defendants filed a dismissal motion challenging the sufficiency of the consolidated complaint. While the motion was pending, George filed a First Amended Consolidated Complaint ("FAC"), which mooted Defendants' dismissal motion. Defendants subsequently filed a dismissal motion challenging the sufficiency of the FAC, which was granted in George v. California Infrastructure and Economic Development Bank ("George I"), No. 2:09-cv-01610-GEB-DAD, 2010 WL 2383520, at *9 (E.D. Cal. June 10, 2010). George was granted leave to amend and subsequently filed the SAC, which is challenged in the dismissal motion sub judice.

The following facts are alleged in the SAC: George and the proposed class members purchased certain section 501(c)(3) revenue bonds issued by I-Bank between June 1, 2007 and December 1, 2008 ("2007 Bonds"). (SAC ¶¶ 2, 14.) I-Bank is "a public instrumentality of the State of California" that "may issue, from time to time, certain tax exempt revenue bonds . . . which . . . create public benefits in California communities where a sponsored project is located by enhancing the economic, social, or cultural quality of life for local residents." Id. ¶ 2. I-Bank "may also issue . . . from time to time, certain refunding revenue bonds." Id. ¶ 3. Orrick is "an entity comprised, inter alia, of Members of the State Bar of California engaged in the active practice of law." Id. ¶ 4. I-Bank employed Orrick to provide I-Bank with legal services in connection with the issuance of the 2007 Bonds. Id. ¶¶ 5-7.

1  I-Bank issued approximately $70 million in revenue bonds in 1999 ("1999 Bonds"). Id. Ex. 1, at 19. I-Bank loaned the proceeds from the sale of the 1999 Bonds to Copia, a non-profit corporation, to finance the construction and development of "a cultural institution, museum and educational center located in Napa, California." Id. Ex. 2, at 1. The 1999 Bonds were secured by a first deed of trust on Copia's real property. Id. ¶ 38. Copia struggled financially, however, and I-Bank and Orrick "began work on a second bond issue in late 2006 or early 2007 in order to try and avoid the impending default on [19]99 Bonds." Id. ¶¶ 40, 46.

I-Bank and Orrick "began work on [the 2007 Bond] issue in late 2006 or early 2007 in order to try and avoid the impending default on [19]99 Bonds." Id. ¶ 46. I-Bank received $77,612,773.55 from its underwriter "and immediately loaned that $77,612,773.55 to [Copia]." Id. ¶ 27. The 2007 Bonds went on sale to the public on or about June 1, 2007, and were marketed through the use of a prospectus (the "Prospectus"). Id. ¶ 28. George and the proposed class members purchased the 2007 Bonds between June 1, 2007 and December 1, 2008. Id. ¶ 14. The 2007 Bonds were secured by a second deed of trust on Copia's real property. Id. ¶ 81. The Prospectus states that "upon the issuance of the [2007] [B]onds, a portion of the proceeds . . . will be deposited in an escrow fund . . . and irrevocably pledged to the payment of the principal and interest and premium on the [1999] Bonds." Id. Ex. 1, at 1.

Despite receiving additional capital, Copia filed for bankruptcy on December 1, 2008. Id. ¶ 82. George alleges that since Orrick never issued a "necessary opinion," "there was never any pre-bankruptcy defeasance of [19]99 bonds" and, as a result, "the

3

underlying obligation of [Copia] on [the 1999 Bonds] was never extinguished." Id. ¶ 81. Since this obligation was never extinguished, the 1999 Bonds "remained secured by an unrecorded equitable lien on [Copia's] assets at the time [Copia] filed for bankruptcy." Id. ¶ 82. George also alleges that Copia's bankruptcy trustee was able "to avoid that unrecorded equitable lien . . . thus putting [the purchasers of the 1999 Bonds and 2007 Bonds] both in the position of being entirely unsecured creditors of [Copia]." Id.

George alleges the following statements contained in the Prospectus are misleading:

> Certain preconditions to the defeasance of [99] Bonds . . . are not expected to be met until September 7, 2007. In particular, the occurrence of an Act of Bankruptcy by [Borrower on or before] . . . September 7, 2007, would prevent the legal defeasance of [99] Bonds from the proceeds of 07 Bonds. Until [99] Bonds are defeased . . . [07] Bonds will be subordinate to [99] Bonds . . . . After the defeasance of [99] Bonds . . . it is expected that . . . [99] Bonds will be deemed paid and no longer outstanding . . . . Assuming that [07] Bonds are delivered in May 2007 and that [an] Escrow Fund is funded on such date of delivery, it is expected that the preconditions to the defeasance of [99] Bonds . . . will be met by September 7, 2007.

Id. ¶ 29. George alleges those statements in the Prospectus are misleading as follows:

> [W]hat is being misrepresented to the reader . . . is that, once September 7, 2007, arrives, and, assuming [Copia] has not then already filed for bankruptcy, [the 19]99 Bonds would be paid off by means of an advance deposit of $71,172,906.34 into escrow and thereby annulled or abrogated consistent with the provision for such advance defeasance ([19]99 Bonds Defeasance) contained in Article X of an Indenture dated July 1, 1999, by and between [I-Bank] on the one hand, and BNY Western Trust Company, on the other hand . . . and that [the 20]07 Bonds would, following such [19]99 Bonds Defeasance, represent [Copia's] only then outstanding bond debt.

4

Id. ¶ 31. George further alleges: "At page 2 of Prospectus there was a misleading description falsely conveying that the preconditions to defeasance of [19]99 Bonds would be met according to the expected timing of such defeasance (not later than September 7, 2007)." Id. ¶ 63. George alleges Defendants "actually knew that the affirmative statements in Prospectus regarding the use to which the proceeds of 07 Bonds were to be put, to wit, for [19]99 Bonds Defeasance, were untrue when made and nonetheless intentionally went ahead and put them in Prospectus despite such actual knowledge of their falsity." Id. ¶ 37.

George also alleges that Orrick:

> [H]ad an affirmative duty to . . . either (i) disclose the fact (and its consequences)—fully and uniquely known to [Orrick], but not known to [the] Proposed Class . . . respecting the express 2007 unwillingness of [Orrick] to opine that the portion of the proceeds from the $77,612,773.55 loaned to [Copia] by [I-Bank] that were being set aside in order to work [19]99 Bonds Defeasance "will not constitute a voidable . . . transfer under the Bankruptcy Code or any similar state or federal statute . . ." or (ii) to instead refrain from acting as [I-Bank's] 07 Bond Counsel in connection with 07 Bonds.

Id. ¶ 64. George further alleges:

> The[se] Misleading Statements and Material Omissions as to the proper and legal defeasance of [19]99 Bonds were false when made because [19]99 Bonds could not be properly and legally defeased without the required legal opinions that (i) the escrow deposit would not be a voidable preference and (ii) the escrow deposit would not be a fraudulent transfer (iii) under the Bankruptcy Code or any similar state or federal statute (iv) should [Copia] become bankrupt or otherwise subject to other insolvency laws.

Id. ¶ 65. George alleges that "[b]ut for the affirmative misrepresentations and omissions alleged, . . . [the] [20]07 Bonds could not have been sold by [I-Bank] at any combination of price and interest rate [that would have] allowed [I-Bank] to make [a] Necessary Finding"

5

under California Government Code section 63046(b) that Copia was "capable of meeting obligations incurred under relevant agreements." Id. ¶¶ 21, 25. George further alleges that as a result of the misleading statements and omissions, he and the proposed class have "been damaged" since the 2007 Bonds they purchased were "patently worthless" and "never had any intrinsic value other than their entirely speculative unsecured distribution rights from [Copia's] bankruptcy estate." Id. ¶ 89.

## II. Discussion

Defendants argue this action should be dismissed because the SAC fails to satisfy all elements of a § 10(b) claim. "Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), in combination with SEC Rule 10b-5, prohibits any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Siracusano v. Matrixx Initiatives, Inc., 585 F.3d 1167, 1177 (9th Cir. 2009) (internal quotation marks omitted). "To state a claim under Section 10(b), a plaintiff 'must [allege] (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" Thompson v. Paul, 547 F.3d 1055, 1060 (9th Cir. 2008) (quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 156 (2008)).

Only the "reliance upon the misrepresentation or omission" element of a § 10(b) claim will be discussed in light of George's following statement in the SAC:

> . . . Given the absence of some other presumption of reliance on fraudulent prospectuses [that is applicable to George's § 10(b) claim]; and further given the exemption from liability under the 1933

6

> Act provided persons such as defendants by 15 U.S.C. §77c(a)(2); the bottom line is that, without the court's acceptance of the "fraud created the market" presumption of reliance urged by [George], defendants would have no liability for Prospectus despite how egregiously fraudulent Prospectus was, in fact, in this case.
>
> . . . .
>
> The members of Proposed Class should be deemed to have relied on Prospectus in that Prospectus was so pervasively and extremely fraudulent that its publication constituted a "fraud which created the market," i.e., the extremely fraudulent Prospectus intentionally and entirely concealed the fact that 07 Bonds could never have been—and were not in fact—legally issued by [I-Bank] consistent with the condition precedent that a Necessary Finding untrained by fraud be made by [I-Bank] [under California Government Code section 63046(b)].

Id. ¶¶ 13, 85.

Defendants rejoin:

> Plaintiff does not dispute that under existing Supreme Court and Ninth Circuit authority, he cannot allege the essential element of reliance. Instead, he asks this Court to expand the scope of Section 10(b) liability by urging adoption of the "fraud created the market" presumption of reliance. Not only have district and appellate courts roundly criticized that doctrine for the last two decades, but the Supreme Court has made clear that the contours of a Section 10(b) [claim] cannot be expanded by creating new exceptions to the reliance element.

(Defs.' Reply Mem. in Supp. of Mot. to Dismiss SAC 1:9-14.)

"The fraud-created-the-market theory posits that '[t]he securities laws allow an investor to rely on the integrity of the market to the extent that the securities it offers to him for purchase are entitled to be in the market place.'" Malack v. BDO Seidman, LLP, 617 F.3d 743, 747 (3d Cir. 2010) (quoting Shores v. Sklar, 647 F.2d 462, 471 (5th Cir. 1981) (en banc)). "A presumption of reliance is established where a plaintiff prove[s] that the defendants conspired to bring to

7

market securities that were not entitled to be marketed." Id. at 747-48 (internal quotation marks omitted). "The fraud-created-the-market theory rests on the conjecture that a '[security's] availability on the market [i]s an indication of [its] apparent genuineness[.]'" Id. at 749 (quoting Shores, 647 F.2d at 470).

> If [George's reliance on the fraud created the market reliance presumption] is based on the idea that almost all marketed securities are, in fact, legally marketable, and therefore we should presume that anything offered on the market has not been stained by fraud, then [George] is advocating for a kind of investor insurance that eliminates the need for proving reliance in *any* securities fraud case. *Any* investor who purchases *any* security could point to the security's availability on the market to satisfy the reasonable reliance element of a § 10(b) claim. . . . The establishment of [such] investor insurance is contrary to the goals of securities laws[, and would] essentially eliminat[e] the reliance requirement for a § 10(b) claim.

Id. at 752, 755.

Here, George "has not articulated any justification for" recognizing the fraud created the market reliance presumption, and the Court "decline[s] to recognize a presumption of reliance based on the [fraud created the market] theory." Id. at 752, 756 Therefore, George's § 10(b) claim is dismissed.

Defendants also argue dismissal should be with prejudice since George cannot plead the reliance element of a § 10(b) claim. "The power to grant leave to amend . . . is entrusted to the discretion of the district court, which 'determines the propriety [of allowing amendment] . . . by ascertaining the presence of any of four factors: bad faith, undue delay, prejudice to the opposing party, and/or futility.'" Serra v. Lappin, 600 F.3d 1191, 1200 (9th Cir. 2010) (quoting William O. Gilley Enters. v. Atl. Richfield Co., 588 F.3d 659, 669 n.8 (9th Cir.

8

2009)). George amended his § 10(b) claim against Defendants pursuant to the leave to amend he was given in George I, yet he failed to cure the reliance element which the court explained was deficient in George I as follows:

> George does not allege that he relied upon the alleged misrepresentations and omissions in the Prospectus when he purchased the 2007 Bonds. Rather, he pleads he "should be deemed to have relied on [the] Prospectus . . . [since the Prospectus' allegedly misleading statements and omissions] constituted a fraud which created the market." (FAC ¶ 78.) George, therefore, does not allege direct reliance, but rather, seeks to establish the reliance element by invoking a "presumption of reliance."
>
> A Rule 10b-5 plaintiff may avoid pleading direct reliance and satisfy the reliance element by invoking a "presumption of reliance" in two situations. Desai, 573 F.3d at 939 (stating "[r]eliance can be presumed in two situations"); see also Stoneridge, 552 U.S. at 159 (stating that "[w]e have found a rebuttable presumption of reliance in two different circumstances"). First, "[i]n *omission cases*, courts can presume reliance when the information withheld is material pursuant to Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)." Desai, 573 F.3d at 939 (emphasis added). Second, "[r]eliance can . . . be presumed in certain circumstances under the so called 'fraud on the market theory.'" Id. Neither of these two recognized reliance presumptions is applicable to George's claim. George, however, requests that the Court recognize and apply a third presumption-the fraud created the market reliance presumption.
>
> . . . .
>
> . . . [T]he fraud created the market theory has not been adopted by the Ninth Circuit. See In re MDC Holdings Sec. Litig., 754 F. Supp. 785, 805-06 (S.D. Cal. 1990) (stating that the fraud created the market theory "has not been adopted by the Ninth Circuit and it has been criticized by courts and commentators."); In re Jenny Craig Sec. Litig., No. 92-0845-IEG (LSP), 1992 WL 456819, at *6 (S.D. Cal. 1992) (stating "[t]he fraud-created-the-market reliance presumption is used in some jurisdictions, but it has not been adopted by the Ninth Circuit.").

Further, the Ninth Circuit's recent decision in Desai calls into question the continued validity of the "fraud created the market" doctrine. See Desai, 573 F.3d at 942. In Desai, the Ninth Circuit affirmed the district court's refusal to adopt a new presumption of reliance based upon the "integrity of the market" when ruling on a motion for class certification in a Rule 10b-5 action. Desai, 573 F.3d at 942. The Ninth Circuit discussed Stoneridge and noted that "the [Supreme] Court listed the Affiliated Ute presumption and the fraud on the market presumption as the [only] two reliance presumptions it has recognized[,] [and][a]fter concluding that neither presumption applied, it did not inquire into any other presumption that seemed appropriate, but simply analyzed whether the plaintiffs could prove reliance directly." Id. (citing Stoneridge, 552 U.S. at 159). The Ninth Circuit then held that under Stoneridge the "district court did not abuse its discretion in refusing to adopt the integrity of the market presumption." Id.; see also In re Refco, 609 F. Supp. 2d at 318 ("[The] merits [of the fraud created the market presumption] . . . appear to be in grave doubt after Stoneridge."). Stoneridge and Desai caution against allowing George to invoke the fraud created the market reliance presumption.

Even if the Court were to adopt and apply the fraud created the market reliance presumption, George has not sufficiently alleged that the 2007 Bonds were either economically or legally "unmarketable." "[George's] allegations . . . fall far short of alleging that [the 2007 Bonds] could not have been sold at any price or that [the 2007 Bonds] could not have been offered at any combination of price and interest rate. Nor are there any allegations that the issuer was prohibited from issuing the [2007 Bonds] as a matter of law." In re Refco, 609 F. Supp. 2d at 318 (quotations and citations omitted). George's conclusory allegations that the 2007 Bonds "were entirely unmarketable" and "patently worthless" are insufficient to satisfy the fraud created the market theory. Id. at 318 n.14 (finding plaintiff's allegation that absent fraud, "there would have been no market for the Bonds" conclusory and insufficient to invoke the fraud created the market theory). "Under these circumstances, [George] cannot rely on a 'fraud-created-the-market' presumption as a stand-in for reliance . . . ." Id. (quotation and citations omitted). George, therefore, has not shown that the fraud created the market reliance presumption may be applied to his claim.

George I, 2010 WL 2383520, at *5-6, 8.

Since George states in the SAC that "the bottom line is that, without the court's acceptance of the 'fraud created the market' presumption of reliance urged by [George], defendants would have no liability for Prospectus despite how egregiously fraudulent Prospectus was, in fact, in this case," (SAC ¶ 13), and George I previously explained George's improper reliance on this presumption, granting further leave to amend would be futile.

### III. Conclusion

For the stated reasons, George's § 10(b) claim against Defendants is dismissed with prejudice. This action shall be closed.

Dated: March 8, 2011

_____
GARLAND E. BURRELL, JR.
United States District Judge